IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. STEVEN K. MAXFIELD and JOHN PETERSON,<br><br>   Plaintiffs,<br><br><br><br><br><br><br>     vs.<br><br><br><br>WASATCH CONSTRUCTORS, a Joint Venture consisting of Granite Construction Company of Utah, Washington Construction Company and Kiewit Construction Company, et al.,<br><br>   Defendants. | MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FOURTH AMENDED COMPLAINT<br><br><br><br><br>Case No. 2:99-CV-00040 PGC |

This is a *qui tam* action in which the plaintiffs Steven Maxfield and John Peterson ("Maxfield") allege that the defendants Wasatch Constructors and others (referred to collectively as "Wasatch") violated the federal False Claims Act ("FCA") and other federal statutes during the massive Interstate 15 reconstruction project around Salt Lake City. In particular, Maxfield alleges that Wasatch made false certifications during the project in order to obtain federal funds. Pending before the court is Wasatch's consolidated motion to dismiss Maxfield's (fourth amended) complaint

on various grounds as well as a separate motion to dismiss by defendant Staker Paving.  The court

grants in part and denies in part the consolidated motion and Staker's motion.

Wasatch's first argument for dismissal is that the plaintiffs did not provide all the details of

their current claims in the written disclosure statement that must be submitted to the government

under the False Claims Act.   As the government has persuasively argued in an *amicus* brief,

however, the disclosure statement is solely for the benefit of the government. Accordingly, Wasatch

lacks standing to raise any question about the adequacy of the disclosure statement.   The motion to

dismiss on this ground is therefore denied.

Wasatch's next argument is that all claims should be dismissed because they never presented

any allegedly false claims directly to an officer or employee of the federal government.  In support

of their argument, Wasatch cites the D.C. Circuit's recent decision in *United States ex. rel. Totten

v. Bombardier Corp.*[1]   In an extended opinion, *Totten* held that presentment of a false claim not to

the federal government but to a federal grantee falls outside of the False Claims Act.   A strong

dissenting opinion, however, argued that the False Claims Act was intended to sweep broadly and

protect against fraud, including fraud involving claims only submitted to a federal grantee.[2]   The

court finds persuasive the dissenting opinion in *Totten*, which accords with several well-reasoned

district court opinions.   Therefore, Wasatch's motion to dismiss on this ground is denied.

On both of these issues – the disclosure-statement issue and the presentment-directly-to-the-

government issue – it is clear that there is a substantial ground for difference of opinion and that an

---

[1]  380 F.3d 488 (D.C.Cir. 2004), *cert. denied*, 2005 WL 576047 (May 16, 2005).

[2]  *Id.* at 512 (Garland, J., dissenting).

2

immediate appeal from this court's order will materially advance the ultimate termination of the litigation.  Therefore, the court certifies these two issues for interlocutory appeal.

Wasatch also raises other fact-specific grounds for dismissal.   As to claims that Wasatch made false claims for fill materials used in the project by improperly weighing truck loads, Maxfield is unable to point to any false certifications made by defendants directly or indirectly to the government.  The court therefore grants the motion to dismiss all claims involving truck fill weight.

As to claims that Wasatch permitted a kickback scheme involving truckers engaged in the project, in violation of the Copeland Act, Maxfield has established that the language of the UDOT contract at the very least required Wasatch to monitor for compliance with the Act and has alleged facts that Wasatch failed to adequately do so.  Wasatch's motion to dismiss the Copeland Act claim is, accordingly, denied.

As to claims that Wasatch improperly diverted materials from a railroad project to the I-15 project, Maxfield can point to no separate contract for railroad work apart from the overall I-15 reconstruction contract.  The court thus grants the motion to dismiss under Rule 12(b)(6) as to plaintiffs' Railroad Act claim.

As to claims that Wasatch used substandard materials and workmanship in the reconstruction, Maxfield has alleged sufficient facts regarding compromised concrete, bridge construction defects and inadequate compaction of fill materials in the project to allow these claims to go forward.  And, contrary to Wasatch's contention, the information relied on by Maxfield in bringing these claims was not in the public domain at the time Maxfield initiated this suit.  The court thus denies the motion to dismiss under Rule 12(b)(6) as to these claims.

Finally, defendants argue that plaintiffs have failed to plead their inadequate compaction claim with particularity as is required for all False Claim Act claims under Fed.R.Civ.P. 9(b).  The court finds, however, that the inadequate compaction claim has been pled with sufficient particularity under Rule 9(b) and thus denies Wasatch's motion to dismiss under Rule 9(b).

Similarly, Staker Paving argues that Maxfield has not pled accusations against it with sufficient particularity under Rule 9(b) and thus that the claims against it must be dismissed on this ground.  The court rejects this argument and denies Staker Paving's motion to dismiss Maxfield's claims on Rule 9(b) grounds.

However, like Wasatch, Staker also argues that plaintiffs have failed to specify any false certifications in support of their truck fill weight claims.  The court agrees and grants Staker's motion to dismiss as to all truck weight claims.

## I.  BACKGROUND

This action involves allegations of fraud in the reconstruction of Interstate 15 (more commonly known as "I-15") in Utah.  The massive I-15 reconstruction project involved extensive construction work throughout the entire Salt Lake metropolitan area for several years.  In April 1997, the Utah Department of Transportation ("UDOT") awarded defendant constructors the contract for the project.  The I-15 Corridor Reconstruction Project Request for Proposal Project No. *SP-15-7(135)296 ("UDOT Contract") was then the largest highway construction contract in the United States.  Under the contract, Wasatch was to design, construct, and monitor the quality control of 17 miles of new highway for a lump sum price.  The Federal Highway Administration ("FHA") identified the work as a "Special Experimental Project" due to the fact that its completion required

4

Wasatch to assume the risk for the design, quality control, and the actual construction of the highway. In exchange, the UDOT Contract provided substantial incentives for early completion. And, in fact, Wasatch received $40 million for its early completion.

Under the UDOT Contract, Wasatch received monthly payments based on the percentage of the project completed. To obtain these payments, Wasatch filed lengthy monthly reports indicating how much of the project was done, areas of compliance with the UDOT Contract, and what problems had occurred. Wasatch had the overall responsibility for Quality Control and Quality Assurance on the project ("QC/QA"). Throughout the project, however, UDOT and the FHA conducted independent verification sampling and testing, independent assurance sampling and testing, and review and oversight. UDOT had the final say on whether or not the completed project was "accepted."

Plaintiff Steven K. Maxfield is the Chief Executive Officer of Mighty Max Truck Parts, Inc., a Utah trucking company. Mighty Max worked as a sub-contractor for defendant Ralph Smith, Co., transporting dirt and other fill materials to and from the I-15 reconstruction site. Plaintiff John Peterson owns and operates a truck and trailer. As an independent contractor, Peterson was engaged by Mighty Max to assist in hauling dirt and other fill materials to and from the I-15 reconstruction project. Maxfield and Peterson together brought this *qui tam* action jointly on behalf of the United States of America.

Maxfield filed his initial complaint under the False Claims Act ("FCA") in January 1999. The matter was kept under seal for over three years to allow the government an opportunity to review the case and determine whether to join the suit. In late 2002, when the court insisted that the

government make a decision, the government decided not to join the suit.  Maxfield then amended his complaint.  Shortly thereafter, in February 2003, Maxfield filed his third amended complaint.  All the defendants moved to dismiss the third amended complaint for lack of specificity and other reasons.  In a lengthy order, the court granted the motion to dismiss for lack of specificity under Federal Rule of Civil Procedure 9(b).[3]  The court did, however, grant leave for Maxfield to file a fourth amended complaint, which he did in July of 2004.

In his fourth amended complaint, Maxfield has raised numerous claims against defendants under the False Claims Act.  Maxfield's first cause of action is for false claims related to payment for fill materials.  Maxfield alleges, among other things, that the trucks hauling fill from the gravel pits to the various I-15 construction sites throughout the Salt Lake Valley were improperly weighed, and that the scales used to weigh the trucks did not conform to the UDOT Contract specifications.  Maxfield's second cause of action is for false claims submitted in violation of the Copeland Act, the federal anti-kickback statute.   According to Maxfield's complaint, defendant Ralph Smith's dispatcher routinely required monetary payments and other favors from truck drivers in exchange for assignments for work on the I-15 Project.  Maxfield's third cause of action arises out of false claims for payment on UDOT's simultaneous railroad project.  Maxfield alleges, for example, that loads of fill material invoiced to be sent to the railroad project were improperly diverted to the I-15 Project.   Maxfield's fourth cause of  action involves alleged false claims for payments for substandard workmanship and materials, including compromised concrete, defective bridge

---

[3] *United States of America ex rel. Maxfield v. Wasatch Constructors*, Case No. 2:99-CV-00040 PGC, Order Granting Motion to Dismiss Under Rule 9(b) and Granting Leave to File a Fourth Amended Complaint (Dec. 23, 2003).

construction, and inadequate compaction of fill material.  Maxfield's fifth cause of action alleges a violation of the Act by making false records of fill material in order to get a false claim paid.  Sixth, Maxfield alleges conspiracy to defraud regarding the truck fill weight measurements.  And Maxfield's seventh and final cause of action involves allegations of delivery of less property than paid for under the Act.  This claim is also premised on allegations of improper truck weight measures.

Defendants now have filed a consolidated motion for dismissal of the fourth amended complaint.  Defendant Staker Paving has also filed a motion to dismiss.

## II.  THE FALSE CLAIMS ACT

Before turning to the merits of the motions to dismiss, a brief review of the False Claims Act may be in order.  Congress originally enacted the Civil False Claims Act in response to allegations of fraud, defective weapons, and illegal price-gouging of the Union Army during the Civil War.[4] Despite this history, the Act did not gain acceptance as a fraud-fighting tool until the 1986 Amendments to the Act.[5]  Under the Act, individuals – in this case Maxfield and Peterson – can bring suits on behalf of the government when they become aware of a scheme to defraud the United States.  The Act provides an award of treble damages to the government and penalties of up to $10,000 per claim.[6]  The *qui tam* action is unique in that it allows for individuals who do not have

---

[4] JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 1.01 (2000 & 2003 Supplement).

[5] *See id.*

[6] 31 U.S.C. § 3729(a).

traditional standing to bring suit on behalf of the United States.[7]  Since the 1986 Amendments, the *qui tam* plaintiff (also referred to as a "relator") can recover "at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim."[8]

## III.  DISCUSSION

Wasatch and the other defendants have filed a consolidated motion to dismiss all of Maxfield's claims.  Staker Paving has also filed its own separate motion to dismiss.  The court will consider each of the grounds raised for dismissal in turn.

### A.  The Adequacy of the Written Disclosure Statement

Wasatch argues that the court should dismiss Maxfield's suit for lack of subject matter jurisdiction under 31 U.S.C. § 3730(b)(2), which requires (among other things) that a relator serve the government with a "written disclosure" statement at the start of a *qui tam* action.  According to Wasatch, the court lacks jurisdiction to adjudicate Maxfield's claims because the disclosure statement that the relators filed did not contain all of the material evidence that relators now rely on for their claims.

Under 31 U.S.C. § 3730(b)(2), in actions brought by private parties under the False Claims Act,

> A copy of the complaint and written disclosure *of substantially all material evidence and information the person possesses* shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure.  The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so

---

[7] *Id.*

[8] 31 U.S.C. § 3730(d)(2).

8

orders.  The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.[9]

Wasatch contends that the statute requires relators to disclose all material information regarding their claims, and that any failure to do so is a jurisdictional defect that mandates dismissal of their claims.

Because of the far-reaching implications of this contention, the United States has appeared as *amicus curiae*.  It argues that Wasatch lacks standing to question the adequacy of the written disclosure statement submitted to the government.  In the government's view,  "[t]he written disclosure requirement is intended to provide *the United States* with enough information to make a decision on whether it should participate in the filed lawsuit or allow the relator to proceed alone with the litigation."[10]   Once the complaint and the disclosure statement are provided to the government, the government must investigate the claims and render a decision as to whether to intervene in the suit or not within 60 days.[11]   If the claims are ill-defined and amorphous, the government can seek dismissal of the relator's suit rather than waste limited government resources on a wild goose chase.

The government's interpretation is persuasive.  As is clear from its context, the written disclosure requirement is designed for the benefit of the government – to help the government to determine whether to intervene in the lawsuit or to move for its dismissal altogether.  The disclosure

---

[9] 31 U.S.C. § 3729(b)(2).

[10] United States' Amicus Curiae Brief In Response to the Coordinated Defendants' Motion to Dismiss Fourth Amended Complaint, at 3 (emphasis added) (citing *United States ex rel. Bagley v. TRW, Inc.*, 212 F.R.D. 554 (C.D.Cal. 2003)).

[11] 31 U.S.C. 3730(a) and 3720(b)(4).

goes to the government – not to defendants – and triggers various responsibilities by the United States.  Nothing in the language or the structure of the Act suggests that defendants can interject themselves into this process and dispute the adequacy of the disclosure as a ground for dismissal of false claims suit.  As the District Court for the Southern District of Georgia has explained, because the written disclosure requirement "plainly inures to the benefit of the government, the Court does not see how . . . [the defendant] has standing to" raise its alleged inadequacy as a grounds for dismissal.[12]

Moreover, defendants in *qui tam* actions plainly have a remedy for challenging the precision with which a *qui tam* complaint has been stated.  This remedy is Fed.R.Civ.P. 9(b), which imposes a heightened pleading requirement for claims involving allegations of fraud and applies to claims brought under the FCA.  Rule 9(b), in requiring relators in a *qui tam* action to plead their claims with particularity, thus provides defendants with detailed noticed about the nature of the claims asserted against them and allows defendants more than an adequate opportunity to investigate prior to filing an answer.

In addition, allowing defendants to question the adequacy of disclosure would undermine the purpose of the FCA – "broadly to protect the funds and property of the Government from fraudulent claims."[13]  Allowing defendants to bring challenges to the sufficiency of disclosures in *qui tam* actions would ultimately frustrate this purpose by potentially introducing added discovery and

---

[12] *United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Blue Cross Blue Shield of Georgia, Inc.*, 755 F. Supp. 1040, 1054 (S.D. Ga. 1990).

[13] *Rainwater v. United States*, 356 U.S. 590 (1958).

motion practice in every *qui tam* action.  Relators, or the Government in cases in which it has decided to intervene, could end up expending considerable time and energy debating the adequacy of the preliminary disclosure statement rather than merits of the *qui tam* action itself.

In response to all this, Wasatch relies heavily on a 2004 decision by the Tenth Circuit – *Kennard v. Comstock Resources, Inc.*[14]  *Kennard* involved a dismissal of a *qui tam* action for previous public disclosure of the information underlying relators' claims.  Under the FCA, previous public disclosure of a false claim bars a *qui tam* action based on that same information.[15]  In *Kennard*, relators had attempted to argue that because they had complied with the written disclosure provisions of § 3720(b)(2), this public disclosure bar did not apply.  *Kennard* rejected this claim, holding that compliance with the requirements of § 3720(b)(2) did not create an "exception" to public disclosure bar.  While *Kennard* did refer to the requirements of § 3720(b)(2) as "jurisdictional" in its opinion,[16] it did so only in *dicta* in the context of the requirement in the subsection that relators serve their complaint upon the government.  At most, *Kennard* should be read to hold that service of the relator's complaint on the government is jurisdictional.  There is no basis for extending *Kennard* to allow litigation over the adequacy of that disclosure.

---

[14] 363 F.3d 1039 (10th Cir. 2004), *pet.n for cert. filed*, 73 USLW 3113 (Aug. 2, 2004) (No. 04-165).

[15] 31 U.S.C. §3730(e)(4)(A).

[16] 363 F.3d at 1043 ("Relators' argument that providing a complaint to the Government in advance of filing immunizes a relator from the operation of the FCA's public disclosure bar is similarly misdirected. Section 3730(e)(4) does not contain an exception for complying with the mandatory jurisdictional requirements of § 3730(b)(2)").

For all these reasons, Wasatch lacks standing to challenge the adequacy of Maxfield's disclosures to the government.  Accordingly, its motion to dismiss on this basis is denied.

**B.  Requirement of "Presentment" to the Government**

Wasatch next urges the court to dismiss Maxfield's claims on the ground that no false claims for payment were ever presented directly to any officer or employee of the United States government. Wasatch contends that under the FCA direct presentment of a claim to an officer or employee of the U.S. government is required.  It points to § 3729(a) in the Act, which places liability on anyone who:

> (1) knowingly *presents*, or causes to be *presented*, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.[17]

Because it is clear under § 3729(a)(1) that liability only attaches if a false claim is directly presented to an officer or employee of the United States government, § 3729(a)(2) should be read in similar fashion, argues Wasatch.  If Wasatch is correct that "direct presentment" to the United States is required to trigger liability under § 3729(a)(2), then all of Maxfield's claims should be dismissed because the allegedly false claims here were presented to a grantee of federal funds – UDOT – rather than directly to the U.S. Government.

This precise legal question was before the D.C. Circuit in the recent case of *Totten v. Bombardier Corp.*[18]  *Totten* involved a *qui tam* suit brought against two railroad car manufacturers

---

[17]  31 U.S.C. § 3729(a)(1) and (2) (emphasis added).

[18]  380 F.3d 488 (D.C.Cir. 2004).

under the FCA for delivering defective railroad cars to Amtrak.  The suit alleged that the companies had violated the Act by submitting false invoices to Amtrak for payment out of Amtrak funds that included monies granted to Amtrak by the federal government.  In a divided decision, the D.C. Circuit held that false claims are actionable under § 3729(a)(2) of the Act only where they have been directly presented to an officer or employee of the U.S. Government.  To read this requirement into § 3729(a)(2), *Totten* relied heavily on the language of § 3729(a)(2) requiring "payment or approval *by the Government*."[19]  If Congress had not intended to require direct presentment to the government under § 3729(a)(2), why the language about payment "by the Government" in § 3729(a)(2), the majority wondered.[20]  The majority also contended that if § 3729(a)(2) did not require presentment of a claim, then § 3729(a)(1) would be rendered essentially meaningless because almost all false claims could be said to involve "false records or statements."[21]  Finally, the majority found it ultimately "unclear whether 'federal monies' . . . are still 'federal monies' when passed along to subgrantees or subcontractors, employees and suppliers of subgrantees and subcontractors, and so on."[22]

In the dissent, Judge Garland argued vigorously that § 3729(a)(2) contains no express presentment requirement.  Judge Garland also argued that the majority's interpretation was

---

[19]  31 U.S.C. § 3829(a)(2) (emphasis added).

[20]  *Totten,* 380 F.3d at 499-500.

[21]  *Id.* at 501.

[22]  *Id.* at 502.

inconsistent with the statutory definition of "claim" contained elsewhere in the statute as well as relevant legislative history.[23]

Here, relators have not alleged in their complaint that false claims were presented directly to any officer or employee of the U.S. government.  If the court followed the majority opinion in *Totten*, then, defendants' motion to dismiss should be granted and the entire case dismissed.

The court, however, agrees with Judge Garland's well-reasoned dissent.  As Judge Garland explained, the starting point for any issue of statutory construction is "the existing statutory text."[24] The plain language of § 3729(a)(2) lacks any "presentment" requirement.  Instead, it allows a suit against anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."[25]  To be sure, the provision also provides that the claim must be paid or approved "by the Government."  But this simply means that the government must be the ultimate source of the funds, either directly or indirectly.

Any doubt on this point is erased by the fact that the term "claim" paid by the government is defined elsewhere in the statute as including contractors and others who receive government funds:

> ["Claim" includes] any request or demand . . . for money or property which is made *to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will*

---

[23]  *Id.* at 510-513 (Garland, J., dissenting).

[24]  *Lamie v. United States Trustee*, 540 U.S. 526 (2004).

[25]  31 U.S.C. § 3729(a)(2).

*reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.[26]*

Congress added this language into the False Claims Act in 1986 precisely to cover the situation at issue in this case.[27]   Under this language, said the Senate Judiciary Committee, "*[A] false claim is actionable although the claims or false statements were made to a party other than the Government*, if the payment thereon would ultimately result in a loss to the United States."[28]  Similarly, the House Judiciary Committee agreed that the new definition of "claim" in § 3729© made clear that "[c]laims or false statements made to a party other that the Government are covered by this term if payment thereon would ultimately result in a loss to the United States."[29]

In addition, to read § 3729(a)(2) as implicitly containing a presentment requirement (as the majority does in *Totten*) would be to essentially read the provision out of the statute.  Section 3729(a)(1) already covers false claims presented directly to the government.  To fold a presentment requirement into § 3729(a)(2) would rend the two provisions essentially identical, contrary to the cardinal rule of construction that "no 'word shall be superfluous.'"[30]  The majority in *Totten* attempts to avoid this problem by suggesting that § 3729(a)(2) would cover situations where persons present

---

[26]  31 U.S.C. § 3729© (emphasis added).

[27]  *See Totten*, 380 F.3d at 512-13 (Garland, J., dissenting).

[28]  *Totten*, 380 F.3d at 204 (quoting S.Rep. No. 99-345, at 10 (emphasis added)).

[29]  H.R.Rep. No. 99-660, at 21.

[30]  *Totten*, 380 F.3d at 505 (Garland, J., dissenting) (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461 n. 13 (2004)).

false claims "that they did not *themselves* present" for payment or approval.[31]  But other provisions of the False Claims Act already seem to essentially cover this situation.  Section 3729(a)(1) covers those who present "or cause[] to be presented" a false claim while § 3729(a)(3) covers those who "conspire[] to defraud" the government.

Judge Garland also seems, to this court, to have the better of the argument on how policy considerations might factor in to the statutory construction issues.[32]  To construe the FCA as covering only false claims presented directly to the government rather than to federal grantees would leave literally hundreds of millions of federal dollars outside of the act.  This case can serve as a convenient illustration.  Wasatch received tens of millions of dollars for its work on the I-15 project, with a substantial portion of these dollars coming from the federal government.  From the perspective of combating fraud in such a program it is a pure happenstance that a federal grantee (UDOT) was the one directly writing the checks.

At the same time, construing the FCA as Judge Garland has does not lead to the "almost boundless" reach of the statute as the *Totten* majority worried.[33]  The FCA allows damages only in situations where the government has sustained a loss.[34]  In such situations – where, by definition, the federal government is being defrauded by not getting its money's worth – it is hard to see any reason for thinking Congress would not desire FCA coverage.

---

[31]  *Id.* at 501-02.

[32]  *Id.* at 513-515.

[33]  *Id.* at 514-515 (Garland, J., dissenting) (discussing the majority's concern at 496-497).

[34]  31 U.S.C. 3729(a).

Three other federal district courts are in accord that there is no "direct presentment" requirement under the Act.[35]  In *United States ex rel. Costa v. Baker & Taylor*,[36] a 1998 case from the Northern District of California, the trial court judge refused to dismiss False Claims Act claims brought by relators against booksellers who allegedly overcharged libraries for books.  Although the booksellers tried to argue that there was not a sufficient "nexus" between the alleged fraud and federal funding to the libraries, the court rejected this argument citing the plain language of § 3729(c) which "allows the United States to recoup monies it granted to states which were then subject to fraudulent overcharging . . . ."[37]  Similarly, *United States v. Nazon*,[38] a 1993 case from the Northern District of Illinois, involved fraudulent Medicare claims allegedly submitted to Blue Cross/Blue Shield, which was then administering a Medicare program wholly out of federal funds.  The court held that to be actionable, the fraudulent claims

> . . . need not be presented directly to the government.  Any claim made to a "contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient" comes within the ambit of the False Claims Act.[39]

---

[35]  Two district courts have followed *Totten*.  *See United States ex rel. Atkins v. McInteer*, 345 F.Supp.2d 1302 (N.D. Ala. 2004); *United States ex rel. Sanders v. Allison Engine Co.*, 2005 WL 713569 (S.D. Ohio 2005).

[36]  1998 WL 230979 (N.D. Cal. 1998).

[37]  *Id.* at 8.

[38]  1993 WL 459966 (N.D.Ill. 1993).

[39]  *Id.* at 2 (quoting 31 U.S.C. § 3729(c)).

Finally, in *Wilkins ex. rel. United States v. State of Ohio*,[40] a case involving FCA claims arising out of the alleged misuse of federal block grant funds made by the federal Department of Health and Human Services to the State of Ohio, the court held that for purposes of the FCA, the definition of "claim" is "broad enough to include any funds provided directly or indirectly by the United States, regardless of whether the grant was in a fixed amount or open-ended."[41]

In sum, the court finds the analysis of the *Totten* dissent – supported by the reasoning of the district courts in *Costa*, *Nazon*, and *Wilkins* – to be persuasive. Section § 3729(a)(2) should not be read as containing a requirement of direct presentment to a government official. Wasatch's motion to dismiss plaintiff's fourth amended complaint for failure to allege presentment of any claims directly to the government is, therefore, denied.

### C. Maxfield's Truck Fill Weight Claims

Wasatch next argues that Maxfield's truck fill weight claims should be dismissed because the UDOT Contract was "lump-sum" and because Maxfield has failed to produce any false certifications made to UDOT. Maxfield responds that the court should instead focus on the bonus incentives for percentage of work completed to find that false claims for payment have been adequately alleged.

In its earlier decision dismissing Maxfield's third amended complaint, the court concluded that Maxfield had "not demonstrated that Wasatch's monthly certifications falsely invoiced UDOT

---

[40]  885 F.Supp. 1055 (S.D. Ohio 1995).

[41]  *Id.* at 1063.

for materials based on the [truck fill weight] invoices."[42]  "At best," the court found, "what has been

alleged is that [subcontractors] bilked Wasatch."[43]  Accordingly, the court emphasized that to survive

dismissal, "Maxfield must connect the alleged improper truck weight allegations either to a specific

invoice presented *to the United States*, or a specific false certification made by Wasatch that it was

in conformity with the UDOT Contract when it was not."[44]

Despite the court's clear direction, Maxfield again has failed to tie the improper truck weight

allegations to any false certification made by Wasatch to UDOT.  By the clear terms of the earlier

order, Maxfield was obligated to show a specific, false certification to UDOT regarding the fill

weights.  This he has not done.  It is worth noting again that nothing in the UDOT contract bases

payment to Wasatch on truck fill weights.  The UDOT Contract provides only for lump-sum

payments based on the percentage of the project completed.  Thus, even if Wasatch did overpay its

subcontractor to the tune of about 4.8 million dollars, this overpayment would only have been out

of Wasatch's own pocket – not the government's.

Maxfield's emphasis on the bonus structure of the Contract does not change the analysis.

Maxfield attempts to somehow tie in the truck fill weights with the percentage of project completed

on which bonus payments were structured.   The argument apparently goes that fill weights were

used by Wasatch to calculate the percentage of project completed for purposes of earning bonuses.

---

[42] *United States ex rel. Maxfield v. Wasatch Constructors*, Case No. 2:99-CV-00040 PGC, Order Granting Motion to Dismiss Under Rule 9(b) and Granting Leave to File a Fourth Amended Complaint (Dec. 23, 2003) at 11.

[43] *Id.*

[44] *Id.*

This argument is fatally flawed, however, because Maxfield points to nothing to show that Wasatch used fill weight in any way to actually calculate the percentage of work completed for purposes of bonus payments. Thus, absent any allegations of actual, specific, false certifications to UDOT, all of relators' claims regarding truck fill weight are dismissed.

### D.  Maxfield's Railroad Project Claim

Wasatch next urges the court to dismiss Maxfield's claim alleging improper diversion of materials from a UDOT Railroad Project to the I-15 Reconstruction Project. Wasatch argues that because there was no separate railroad project contract – i.e., no contract separate and distinct from the I-15 UDOT Contract – no "improper" diversion of materials can be said to have taken place. Maxfield does not counter this argument in its brief, and the court thus agrees with Wasatch that Maxfield's railroad project claim should be dismissed.

### E.  Maxfield's Copeland Act Claims

Wasatch also asks the court to dismiss Maxfield's Copeland Act claims. The Copeland (Anti-Kickback) Act,[45] prohibits kickback schemes by government contractors. Maxfield alleges that Smith Trucking Company, a Wasatch subcontractor, solicited kickbacks from the truck drivers employed by them to haul dirt and fill to and from the I-15 work sites. According to Maxfield, one of Smith's dispatchers required payments to allow a driver access to the job site and he argues that Wasatch knew or should have know about these violations. For its part, Wasatch maintains that the claims should be dismissed because it never certified that all of its subcontractors had complied with the Copeland Act.

---

[45] 18 U.S.C. §1951.

20

The court rejects Wasatch's challenge to Maxfield's Copeland Act claims.  In paragraphs 75 and 76 of their complaint, Maxfield alleges that both the UDOT Contract and sec. 2.2.6 of the RFP required compliance with the Copeland Act.  While the parties may disagree as to whether the Contract or RFP requires certification of actual "compliance" with the Copeland Act, at the very least the relevant language suggests a duty to "monitor" for compliance with federal law.  This being so, the court finds that there are sufficient questions of adequacy of monitoring appropriate for further investigation in this case.  Wasatch's motion to dismiss Maxfield's Copeland Act claims is, therefore, denied.

### F.  Maxfield's Substandard Workmanship Claims

Wasatch has also asked the court to dismiss Maxfield's substandard workmanship and materials claims on the grounds that Maxfield was not an "original source" of information on these points.   On the contrary, Wasatch argues, most of the information regarding substandard workmanship and materials involved in the Project was already in the public domain at the time Maxfield filed suit.  Thus, Maxfield's claims fall under the "public disclosure" bar of 31 U.S.C. § 3730(e)(4).

However, after careful review of the public materials supplied by Wasatch in support of its motion, and given Maxfield's emphasis on "field trips" taken with the FBI and notices to the government predating all public disclosures, the court cannot say unequivocally at this stage of the litigation that all information relied on by Maxfield was in the public domain at the time he initiated suit.  As one illustration, the public domain information provided by Wasatch does not address allegations such as those that a second layer of concrete was poured on the pre-cast deck panel at the

17th South bridge in April 1999, without removing sawdust, dirt and sand that had accumulated. Moreover, there is enough evidence to suggest that even if that information eventually did make it into the public domain, it only did so after Maxfield had already raised it. Although a close question, in the court's view there are factual issues which preclude dismissal of these claims at this time. Wasatch's motion to dismiss the substandard workmanship and materials claims is denied.

### F. Wasatch and Staker's Rule 9(b) Challenge

Wasatch next argues that Maxfield's inadequate compaction claims should be dismissed because they have not been plead with the requisite particularity under Civil Rule 9(b).

Staker argues that none of the claims asserted against it have been pled with particularity. In the earlier order dismissing the third amended complaint, this court indeed held that *qui tam* actions must comply with the heightened pleading requirements of Civil Rule 9(b).[46] In his fourth amended complaint, however, Maxfield has now pled these inadequate compaction claims with sufficient particularity. For example, in paragraphs 108 and 109 of their complaint, relators give specific dates and geographic locations for the alleged inadequate compaction work. These paragraphs state:

> 108. On June 11 and 12, 1998, Wasatch Constructors used a bank run/base concourse material that did not meet the Utah guidelines described in the UDOT Contract for compactible material in the I-15 Project at 7200 South.
> 109. Additionally, Wasatch Constructors failed to mechanically compact fill material in the I-15 Project at 7200 South on June 11 and 12, 1998 as required by federal requirements and/or industry standards.

---

[46] Fed. R. Civ. Pro. 9(b).

This satisfies the heightened pleading standard of Rule 9(b).  Maxfield has also pled its claims against Staker with sufficient particularity.  Wasatch's motion to dismiss the inadequate compaction claims under Civil Rule 9(b) and Staker's motion to dismiss all claims under Rule 9(b) are accordingly, denied.

## IV.  CERTIFICATION FOR INTERLOCUTORY APPEAL

Having done its best to resolve the issues before it, the court must acknowledge that at least two of these resolutions are subject to considerable legal uncertainty.  With respect to the first issue discussed in this opinion – whether a defendant has standing to challenge the adequacy of a relator's written disclosure statement – the Tenth Circuit's recent decision in *Kennard*[47] contains language that can be construed to reach a conclusion opposite that of the one reached by this court.  Moreover, this issue is extremely important, as evidenced by the amicus brief filed by the United States which reports that the United States' "ability to enforce the FCA in the future" is potentially implicated.[48]

With respect to the second issue discussed in this opinion – whether § 3792(a)(2) contains a direct presentment requirement – there are certainty reasonable grounds for dispute.  The court has reached a conclusion opposite to that reached by a lengthy opinion from the D.C. Circuit.

These two issues are both critical to this litigation. If the court is wrong on either of these conclusions, it may well be that this complex litigation should be terminated now.  In other words, both of these issues are potentially dispositive of the case as a whole, so an immediate appeal from

---

[47] 363 F.3d 1039 (10th Cir. 2004).

[48]  United States' Amicus Curiae Brief in Response to the Coordinated Defendants' Motion to Dismiss Fourth Amended Complaint, at 2.

23

a decision on these issues will materially advance the ultimate conclusion of this case.  Accordingly, the court invites an interlocutory appeal on these issues and certifies these issues for appeal to the Court of Appeals for the Tenth Circuit pursuant to 28 U.S.C. § 1292(b).  Because these issues are likely dispositive, and because the parties are likely to spend tens of thousands of dollars if discovery proceeds in this matter, the court stays all further proceedings in this case while interlocutory review is sought.

## V.  CONCLUSION

Wasatch's motion to dismiss Maxfield's inadequate compaction claims is denied.  Wasatch's motion to dismiss Maxfield's truck fill weight and railroad project claims is granted.  Wasatch's motion to dismiss Maxfield's Copeland Act and substandard workmanship/materials claims is denied.  Staker's motion to dismiss truck fill weight is granted..  Staker's remaining claims in its motion to dismiss are denied.  The court certifies for interlocutory appeal its rulings that (1) Wasatch lacks standing to raise § 3720(b)(2) as a bar to Maxfield's suit and (2) that no presentment requirement is contained in § 3729(a)(2).  All proceedings in this matter are stayed pending the parties' pursuance of interlocutory review.

DATED this 27th day of May, 2005.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge